Baldwin Brothers, Inc., et al. [1] v. Commissioner. Baldwin Bros., Inc. v. Commissioner
Docket Nos. 4571-63 - 4575-63.
United States Tax Court
T.C. Memo 1965-173; 1965 Tax Ct. Memo LEXIS 153; 24 T.C.M. (CCH) 917; T.C.M. (RIA) 65173; June 28, 1965
John E. Britton, 615 Masonic Bldg., Erie, Pa., for the petitioners. Gerald Backer, for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Year
Deficiency
Baldwin Bros., Inc.
Yr. ended 10/31/60
$ 5,801.64
Yr. ended 10/31/61
4,434.59
J. Robert Baldwin and Ruth D. Baldwin
1959
3,838.21
1960
7,273.54
1961
7,166.37
Tenth Street Building Corporation of Erie
Yr. ended 9/30/60
12,280.26
Yr. ended 9/30/61
15,157.07
Baldwin Builders, Inc.
Yr. ended 3/31/60
5,923.80
Yr. ended 3/31/61
3,464.91
Yr. ended 3/30/62
3,396.74
Arthur W. Baldwin and Nancy F. Baldwin
1960
7,298.22
1961
7,552.53
*154 The issues for decision [2] are similar in each case and are whether the Commissioner erred in failing to allow alleged losses incurred by the petitioners under leases of apartments from Baldwin Gardens Apartments, Inc. Numbers 2, 3, 4, 5, 6 and 10, each of which corporation was wholly owned by one of the petitioners. Findings of Fact Arthur W. and Nancy F. Baldwin are husband and wife as are J. Robert and Ruth D. Baldwin. They all live in Erie, Pennsylvania. Arthur and Robert are equal partners in Baldwin Brothers. The corporate petitioners and the six Baldwin Gardens Apartments, Inc., are all Pennsylvania corporations, having their principal office at 1002 State Street, Erie, Pennsylvania. All returns for the petitioners were filed with the district director for the district of Pittsburgh. The six Baldwin Gardens Apartments, Inc., were incorporated in May 1951. The other corporations were incorporated in the 1940's. All used the cash method of accounting except Baldwin Brothers, Inc., which used an accrual method. Each used a fiscal year in accounting and reporting. J. Robert Baldwin was president *155 of each corporation. Each Gardens during 1951 borrowed money from an Erie bank on a mortgage and used the money to build its apartments. The Gardens No. 3 mortgage was for $442,900. The record does not show the amounts borrowed by the other Gardens corporations. The apartment buildings and the construction were approved by Federal Housing Administration. Each of the Gardens had 56 apartments. The entire outstanding common stock of the Gardens corporations was acquired by the petitioners as follows: Gardens No.
Acquiring Petitioner
Date
2
Baldwin Brothers, Inc.
May 1, 1956
3
Baldwin Builders, Inc.
May 1, 1956
4
Tenth Street Building
May 1, 1956
10
Corporation of Erie
5
Baldwin Brothers
June 12, 1959
6
(Partnership)
All 100 shares of $1.00 par value preferred stock of Gardens No. 3 was issued to FHA. The par value of the Gardens No. 3 common stock was $100, but the record does not show whether the stock of the other Gardens had the same par value and how much of it was issued. Nor does the record show how much money was paid into any of the Gardens corporations for the common stock or what their assets and liabilities were. The record does *156 not show who owned the stock of the corporate petitioners. The Gardens are all on a fiscal year ended April 30. The income of the Gardens was entirely from rents except for a relatively small amount of Reserve Fund Bond interest. The rental income of Gardens No. 2 ranged from a low of $5,289.42 for 1954 to a high of $55,428.10 for 1957. The rent for 1959 was $45,952.88. Its largest net income was $6,282.77 for 1956. Its profits declined during 1957 and 1958 and in 1959 it had a loss of $3,966.05. It also had losses in the years 1952 through 1955. The rental income received by Gardens No. 3 ranged from a low of $18,828.40 in 1953 to a high of $58,159.87 in 1958. It declined to $47,622.32 in 1959. It had a loss of $2,848.30 for 1959 and it also had losses for 1952, 1953 and 1955. Its highest net income was $6,062.95 for 1956. The largest rental income received by Gardens No. 4 was $56,889.47 for 1957. In 1959 $52,882.64 was received. It had losses for 1952, 1953 and 1955. Its net income was $5,095.69 for 1956 and for 1959 it was $2,206.12. The highest amount of rents received by Gardens No. 5 was $56,462.63 for 1957. It received $50,408.22 in 1959. Its highest net income was *157 $5,634.09 for 1956. It had net income of $2,739.01 for 1958, a loss of $640.78 for 1959 and for the years 1952 through 1955 it sustained losses. The highest amount of rent income received by Gardens No. 6 was $57,322.30 for 1956. This income declined during the next three years and for 1959 it was $41,889.00. Its greatest net income was $6,345.07 for 1956. It had losses in 1952, 1953, 1954 and 1958 and its net income for 1959 was $3,800.20. The largest amount of rental income received by Gardens No. 10 was $56,453.65 for 1957. It declined to $47,341.15 in 1959. Its highest net income $5,921.99 for 1956. It had smaller net income in 1957 and 1958 and for all other years had losses. The loss for 1959 was $3,367.90. The largest expenses of these six corporations were for taxes, mortgage payments, and insurance. The total expenses for 1959 were as follows: Gardens No.
Total Expense
2
$50,303.13
3
50,854.83
4
51,060.73
5
51,433.20
6
38,489.50
10
51,093.25
The federal income tax returns of the six Gardens corporations for their fiscal years from their beginning through April 30, 1959, show excesses of losses over profits in the following total amounts *158 for the eight years: Excess of Losses
Gardens No.
Over Profits Reported
2
$30,408.64
3
4,121.89
4
10,599.53
5
25,062.67
6
451.88
10
17,790.12
Total
$88,394.73
The percentage of occupancy of each of the six Gardens declined during the years 1957 through 1959. They were as follows for the periods stated: Percentage of Occupancy
Year Ended
At July 1,
Gardens No.
April 30, 1959
1959
2
80.76
70.72
3
78.94
71.83
4
85.64
82.86
5
83.26
69.86
6
80.80
73.86
10
78.93
73.23
The stipulation of the parties is in part as follows: On July 1, 1959 documents denominated "leases" were entered into between the various petitioners providing for the purported leasing in each case of 55 of the 56 apartments owned by the "Garden" corporations (the balance of the apartments (1 apartment) and the garages were not involved): Purported Lessor
Gardens #2
Baldwin Brothers, Inc.
Gardens #3
Baldwin Builders, Inc.
Gardens #4)
(Tenth Street Building
Gardens #10)
(Corporation of Erie
Gardens #5)
Baldwin Brothers (Part-
nership)
Gardens #6) Each of the documents denominated "leases" was for a period *159 ending April 30, 1960, and each was renewed each April 30 until their cancellation on September 29, 1962. The only copies of such documents in evidence are copies of those between Gardens No. 3 and Baldwin Builders, Inc., for the three years beginning May 1, 1960. The amount of rent mentioned in each of those documents is $35,640 per year or $2,970 per month. Those documents provided for renewals without other change. Baldwin Bros., Inc., Baldwin Builders, Inc., and Tenth Street Building Corporation of Erie, whose fiscal years differed from the lease periods, reported "losses" in connection with the "purported leases" for their tax years involved herein as follows: Baldwin Bros., Inc. - Re Gardens corporation No. 2
Fiscal Year Ending 10/31/60
Income
$39,094.66
Expenses
53,498.31
Loss
$14,403.65
Fiscal Year Ending 10/31/61
Income
$39,571.42
Expenses
54,119.10
Loss
$14,547.68
Baldwin Builders, Inc. - Re Gardens corporation No. 3
Fiscal Year Ending 3/31/60
Income
$30,003.16
Expenses
40,519.61
Loss
$10,516.45
Fiscal Year Ending 3/31/61
Income
$41,735.16
Expenses
51,217.14
Loss
$ 9,481.98
Fiscal Year Ending 3/31/62
Income
$43,415.09
Expenses
51,752.38
Loss
$ 8,337.29
Tenth Street Building Corporation - Re Gardens corporation No. 4
Fiscal Year Ending 9/30/60
Income
$40,571.66
Expenses
51,246.28
Loss
$10,674.62
Fiscal Year Ending 9/30/61
Income
$38,785.66
Expenses
53,087.80
Loss
$14,302.14
Tenth Street Building Corporation - Re Gardens corporation No. 10
Fiscal Year Ending 9/30/60
Income
$37,648.90
Expenses
51,904.66
Loss
$14,255.76
Fiscal Year Ending 9/30/61
Income
$38,605.56
Expenses
53,497.77
Loss
$14,892.21
*160 The expenditures shown on the books and records of each included amounts for administration, advertising, repairs and decorations, janitorial services, electricity, gas, water and sewer and rent paid, all of which it was understood were to be paid by the lessees. Baldwin Bros., Inc., showed rent paid to Gardens No. 2 for each period at the rate of $39,600 per year. Baldwin Builders, Inc., showed rent paid to Gardens No. 3 in the amount of $33,000 for the ten months' period ended April 30, 1960 and $35,640 for each of the following two years. Tenth Street Building Corporation showed rent paid to Gardens No. 4 at the rate of $38,880 per year and to Gardens No. 10 at the rate of $39,600 per year. Baldwin Bros., Partnership, showed rent paid to Gardens No. 5 at the rate of $38,880 per year and to Gardens No. 6 at the rate of $39,600 per year. The following table shows for each lease period the rents received from tenants in each of the Gardens, the total operating expenses, including rentals paid, and the excess of the expenses over the rentals received from tenants: 10 Months Ended
12 Months Ended
April 30
April 30
1960
1961
1962
Gardens No. 2
Rents Received from Tenants
$30,399.66
$40,647.00
$39,532.92
Operating Expenses
49,678.52
52,809.83
57,196.79
Excess of Expenses Over Receipts
$19,278.86
$12,162.83
$17,663.87
Gardens No. 3
Rents Received from Tenants
$33,857.66
$41,845.16
$42,732.80
Operating Expenses
45,567.60
51,411.25
52,523.24
Excess of Expenses Over Receipts
$11,709.94
$ 9,566.09
$ 9,790.44
Gardens No. 4
Rents Received from Tenants
$35,870.66
$38,166.16
$43,090.14
Operating Expenses
44,688.92
52,856.84
54,627.44
Excess of Expenses Over Receipts
$ 8,818.26
$14,690.68
$11,537.30
Gardens No. 5
Rents Received from Tenants
$30,716.60
$35,850.16
$32,787.40
Operating Expenses
44,767.39
52,981.84
54,694.72
Excess of Expenses Over Receipts
$14,050.79
$17,131.68
$21,907.32
Gardens No. 6
Rents Received from Tenants
$33,840.00
$37,116.20
$38,860.76
Operating Expenses
46,410.93
53,167.66
54,954.05
Excess of Expenses Over Receipts
$12,570.93
$16,051.46
$16,093.29
Gardens No. 10
Rents Received from Tenants
$30,920.50
$39,091.16
$39,459.70
Operating Expenses
45,029.41
53,150.69
54,611.35
Excess of Expenses Over Receipts
$14,108.91
$14,059.53
$15,151.65
*161 All of the so-called leases were renewed for the tax years despite the consistent "losses." The Commissioner in determining the deficiencies disallowed "the losses claimed" by the petitioners on their returns, "resulting from alleged lease arrangements with Baldwin Gardens Apartments, Inc.," with an explanation that those losses "do not constitute allowable deductions under the provisions of section 162, 165 and/or 482 of the Internal Revenue Code of 1954," and, also, in the case of the individuals, section 212. The occupancy of the apartments had declined to such an extent that none of the Gardens could have made their mortgage payments due on July 1, 1959. They had already borrowed from other sources the maximum amount that they could borrow under the law. Robert Baldwin thought that the first thing to do would be to remove the threat of mortgage default by each of the Gardens corporations. He called a meeting of several Baldwin employees, including the best available talent, to determine what could be done to save the situation. He directed Allen B. Currie, an experienced employee of the partnership, to go to the Gardens apartments, survey the conditions *162 existing and make recommendations to improve the situation in order to avoid default on the mortgages which he thought would hurt the business of the petitioners. Currie reported that the one man who was managing all the Gardens apartments was doing a poor job due in part to illness, his relations with tenants were strained and causing vacancies, apartments and halls needed to be redecorated, landscaping needed to be improved, the laundry rooms had been mismanaged and tenants had been alienated, the play areas for children had not been kept up, and the local need for furnished apartments was not being fulfilled. It was decided that leases should provide for cancellation if a tenant found himself about to be transferred from the locality. Robert thought that many of the troubles could be corrected and their correction might improve occupancy within several months, but improvements would cost money and the Gardens did not have sufficient money to carry out such a program. The recommendations were discussed by Robert with his tax accountants and tax counsel, in order to decide what method should be adopted. Merging the Gardens with other corporations was rejected because Robert believed *163 it would have to have the consent of FHA, which would require the other corporations to assume and agree to pay the mortgages, whereas, in Robert's estimation, the mortgages were in excess of or very close to the value of the property and he did not want the other corporations to assume liability on the mortgages. The leases were entered into so that the Gardens would have sufficient money to make the required payments on their mortgages, taxes and other fixed charges. Robert directed Allen B. Currie to take over the management of the apartments for the lessees and he began to make the changes and improvements which he had reported were needed. Robert assigned another employee the task of supervising and setting up a program to increase occupancy. Robert made furniture available (in some way not disclosed) so that apartments could be rented furnished. He persuaded the City Recreation Department to improve nearby playgrounds and he took other steps to increase occupancy, including advertising by newspapers and radio. Many tenants were secured but economic conditions in Erie declined and many moved out of the Gardens apartments. As May 1962 approached, Robert reappraised the situation *164 and, to protect the petitioners, a clause was placed in the leases giving the lessees the right to terminate a lease upon giving the Gardens apartments thirty days' notice. The leases were terminated on October 1, 1962. The record does not show what then was done about the Gardens corporations. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The petitioners have the burden of proof to show that the deficiencies are incorrect. The evidence fails to show that the Commissioner erred in determining, pursuant to section 482, that "gross income, deductions, credits or allowances" involved herein should be distributed, apportioned or allocated to the corporations owning the apartments, rather than to the petitioners, as a necessary measure "in order to prevent evasion of taxes or clearly to reflect the income" of the petitioners. All of the apartment houses owned by the six Baldwin Gardens Apartments, Inc., had been operated under the management of one man. He had not been well and occupancy and rentals had been declining. The Baldwins became concerned because the Gardens were without funds to make the required payments on their mortgages and *165 a default, they believed, would bring all of the Baldwin organizations into disrepute with FHA. They therefore decided to have the owners of the stock of the Gardens corporations lease the apartments from the Gardens corporations; pay sufficient rent for each apartment to enable each lessor to avoid default by meeting its fixed charges, such as monthly mortgage payments, taxes and any others; and expend the money which would be needed to make the apartments attractive to tenants. Currie, a competent manager, already in the employ of the Baldwin Brothers partnership, was made manager of all of the apartment houses. He continued in that position at all later times material hereto. He contacted dissatisfied tenants and made changes of various kinds in an effort to satisfy them. He had recommended and he made most, if not all, of the changes in the apartment buildings and in the operation of those buildings. They were painted and cleaned inside and out, the halls were made clean and fresh, the landscaping was improved, apartments were redecorated in colors approved by the tenants. The work to increase occupancy was started soon after the leases were executed by the Gardens corporations *166 and was continued. Efforts were made to secure and hold new tenants. Robert Baldwin testified that the proposed changes could be expected to increase occupancy within several months and to produce profits. However, he must have realized that the possibility, or probability, of loss was obvious and, taxwise, it would be more advantageous for the petitioners, with income from other sources, to pay and deduct the rentals and to assume the risk of losses than to leave the burden on the Gardens, which had no unrelated income to be offset by losses and which would have to receive immediate capital contributions from their stockholders to remain solvent and in business. The rental plan relieved the impoverished Gardens of all operating expenses and improvement costs and gave them money to meet the required mortgage obligations, taxes and other fixed charges. That was apparently the principal reason for using that method. The evidence does not negate the possibility that the risks involved were greater than a third party would have been willing to assume. The lessees agreed to pay a substantial fixed rent on 98.21 percent of the apartments when occupancy was low and declining and they assumed *167 all rejuvenating and operating costs. The position taken by the Commissioner gains support as time passed and the leases were voluntarily renewed by the lessee despite continuing losses and without any current changes being requested or adopted. Finally the leases were cancelled with results not shown in the present record. The evidence as a whole does not sustain the petitioners' contention that the rent and expenses which the lessees agreed to pay were reasonable in amount under the known conditions or that the lessees had a fair prospect of profit from anticipated subleasing. Financial aid to the Gardens and tax deductions for the petitioners were apparently strong incentives for entering into the leases. Obvious advantages in the plan adopted to preserve the Gardens corporations were that the lessees, as opposed to the Gardens, had the funds necessary to make the apartments more attractive and could gain some tax advantages from losses. The evidence does not show that the lessees contributed in other essential or important ways to the operation of the apartments. Capital contributions to the Gardens by their stockholders were not attractive from a tax standpoint and the Baldwins *168 doubted that the values of the properties of the Gardens exceeded the mortgage debts. Section 482 gives the Commissioner power which could be misused but here there is no fair preponderance of evidence to show misuse of that power. The Commissioner did not err in applying section 482. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: J. Robert Baldwin and Ruth D. Baldwin, Docket No. 4572-63; Tenth Street Building Corporation of Erie, Docket No. 4573-63; Baldwin Builders, Inc., Docket No. 4574-63; and Arthur W. Baldwin and Nancy F. Baldwin, Docket No. 4575-63.↩
2. Issue 4d. in Docket No. 4572-63, has been conceded by the Commissioner.↩